Filed 5/20/21  P. v. Caylor CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEFFREY MICHAEL CAYLOR,<br><br>Defendant and Appellant. | C084183<br><br>(Super. Ct. No. 14F01906) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KARI ANN HAMILTON,<br><br>Defendant and Appellant. | C084401<br><br>(Super. Ct. No. 14F01906) |

Defendant Jeffrey Michael Caylor was convicted of special circumstance, first degree murder of Hassan Alawsi, attempted murder of Vineet Parnami, and robbery of

1

Lillian Thury-Taylor, along with other crimes and enhancements. The trial court sentenced him to life without possibility of parole, plus additional terms.

Defendant Kari Ann Hamilton was convicted of being an accessory to the murder of Alawsi. She was also convicted of attempted murder of Parnami and robbery of Thury-Taylor, along with other crimes and enhancements. The trial court sentenced her to a determinate term of 13 years.

Defendants now make the following contentions: (1) Caylor contends the trial court erred by denying (A) his motions to replace appointed counsel (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)) and (B) his motion to represent himself (*Faretta v. California* (1975) 422 U.S. 806, 836 [45 L.Ed.2d 562, 582] (*Faretta*)); (2) Caylor and Hamilton both contend the trial court abused its discretion and violated their due process and fair trial rights by admitting video evidence of Caylor taking a gun from Hamilton's purse more than a year before the current crimes; (3) Caylor and Hamilton both contend the trial court abused its discretion and violated their constitutional due process rights when it denied a defense motion to exclude evidence of derogatory racial remarks Caylor had made about Parnami; (4) Hamilton contends the trial court prejudicially erred by instructing the jury on the defense of withdrawal as an aider and abettor; (5) Hamilton contends the evidence was insufficient to support her conviction for attempted murder of Parnami as an aider and abettor because there was insufficient evidence of the intent of Caylor and Hamilton to kill Parnami and of Hamilton's acts to encourage or facilitate the attempted murder; (6) Hamilton contends the trial court erred by not staying the term for her vehicle theft conviction under Penal Code section 654[1] because the robbery and vehicle theft were one indivisible course of conduct; and (7) Hamilton contends we must

---

[1] Undesignated statutory references are to the Penal Code.

vacate the imposed assessments and stay the restitution fine because the trial court did not determine her ability to pay.

We conclude: (1) the trial court did not err by denying Caylor's motions to replace appointed counsel and to represent himself; (2) the trial court did not abuse its discretion or violate defendants' constitutional rights by admitting video evidence of Caylor taking a gun from Hamilton's purse; (3) the trial court did not abuse its discretion or violate defendants' constitutional due process rights by admitting evidence of Caylor's derogatory racial remarks about Parnami; (4) the trial court's instruction on withdrawal from aiding and abetting was not prejudicial even if it was erroneous; (5) the evidence was sufficient to support Hamilton's conviction for attempted murder of Parnami; (6) the term imposed on Hamilton for the vehicle theft must be stayed under section 654; and (7) the principles of due process did not require determination of Hamilton's present ability to pay before imposing the assessments and restitution fine.

Therefore, we will affirm the judgment as to Caylor and we will modify the judgment as to Hamilton by staying the term imposed for vehicle theft. We will affirm the judgment as to Hamilton as modified.

BACKGROUND

Caylor and Hamilton were boyfriend and girlfriend and lived together along with Hamilton's teenage son. Caylor and Hamilton ran a smoke shop together. Parnami was their landlord and ran a convenience store in the same strip mall. Caylor and Hamilton were both abusive toward Parnami, yelling at him, disparaging him, and telling him to get out of their country. Caylor and Hamilton each had such run-ins with Parnami about 20 to 30 times. Caylor told Parnami that Caylor had killed people and would come after Parnami and his family if Parnami did not do what he wanted him to do. In November 2012, Parnami found footage from his security camera showing Hamilton giving a handgun to Caylor as they left the smoke shop. Parnami evicted Hamilton and Caylor in December 2013 for failure to pay rent.

3

On March 16, 2014, Caylor, Hamilton, and Hamilton's son went to Home Depot in Sacramento. Hamilton and her son went inside, while Caylor stayed outside in a green Buick owned by Hamilton's mother. Also at Home Depot were Alawsi and his sister. Alawsi's sister was wearing a flowing blouse, with black pants and a black head scarf. After Hamilton and her son came back out to the green Buick and got into the car with Hamilton in the front passenger seat, Caylor drove next to the car where Alawsi was shutting the trunk. Caylor said something in an angry tone to Alawsi, pointed Hamilton's handgun at Alawsi, and shot him. Alawsi died as a result of the shooting.

Later the same evening, Caylor and Hamilton went to the home of Thury-Taylor, who was sitting outside her residence in a car she had rented, a white Toyota. First Caylor and then Hamilton approached Thury-Taylor, telling her that she needed to go inside because there was danger. When Thury-Taylor went inside, Caylor followed her into the house and pointed a handgun at her. He told her he wanted her car. He pistol-whipped and choked her, and he left. Thury-Taylor found that the key to the white Toyota was gone. Later, after returning home from getting treatment, Thury-Taylor discovered that the white Toyota had been taken.

The next morning, on March 17, 2014, Caylor drove to Parnami's business in the white Toyota, with Hamilton and her son as passengers. Hamilton was in the front passenger seat. Parnami was outside the store. He had not seen Caylor and Hamilton since he evicted them in December 2013. Caylor drove within five feet of Parnami, pulled Hamilton's handgun from between the seats, pointed it at Parnami, and pulled the trigger three times. Parnami heard three clicks, but the gun did not fire. Caylor said something like "You're lucky I haven't killed you," or "You're lucky it didn't go," or "You're lucky I still like you," or "You're lucky," and drove away. As he was driving away, Caylor said, "I almost got him."

Caylor, Hamilton, and Hamilton's son headed north for Idaho in the white Toyota, stopping to buy more ammunition. They were detained in Chico later that day. A search

4

of the white Toyota revealed Hamilton's handgun and the package of ammunition, unopened. A live round was chambered, and additional rounds were in a magazine.

A firearms expert testified that he test-fired Hamilton's handgun three times using ammunition he had in the lab, and the handgun fired each time. He also testified that, if there was a problem with the ammunition, it was possible the handgun would not fire when the trigger was pulled even though the handgun was in working condition. Tests of the handgun showed that it did not make a clicking sound when the trigger was pulled with the safety on but made a loud clicking noise when the safety was off.

A jury convicted Caylor of: (1) first degree murder of Alawsi (§ 187, subd. (a)) with a special circumstance of discharging a weapon from a vehicle (§ 190.2, subd. (a)(21)) and a finding that Caylor discharged a weapon causing death (§ 12022.53, subd. (d)); (2) possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)); (3) first degree robbery of Thury-Taylor (§ 211) with a finding that he personally used a firearm (§ 12022.53, subd. (b)); (4) first degree burglary of Thury-Taylor (§ 459) with a finding that he personally used a firearm (§ 12022.53, subd. (b)); (5) assault on Thury-Taylor (§ 245, subd. (a)(2)) with findings that he personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)(1)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)); (6) vehicle theft (§ 10851, subd. (a)); and (7) attempted murder of Parnami (§§ 664/187, subd. (a)) with a finding that he personally used a firearm (§ 12022.5, subd. (a)(1)).

The jury convicted Hamilton of: (1) being an accessory to murder (§ 32); (2) first degree robbery of Thury-Taylor (§ 211) with a finding that a principal was armed with a firearm (§ 12022, subd. (a)(1)); (3) first degree burglary of Thury-Taylor (§ 459) with a finding that a principal was armed with a firearm (§ 12022, subd. (a)(1)); (4) vehicle theft (§ 10851, subd. (a)); and (5) attempted murder of Parnami (§§ 664/187, subd. (a)) with a finding that a principal was armed with a firearm (§ 12022, subd. (a)(1)).

5

The trial court sentenced Caylor to an aggregate unstayed determinate term of 25 years, eight months with a consecutive indeterminate term of life without possibility of parole, plus 25 years to life.

The trial court sentenced Hamilton to an aggregate unstayed term of 13 years.

DISCUSSION

I

Caylor contends the trial court erred by denying (A) his motions to replace appointed counsel (*Marsden, supra*, 2 Cal.3d 118) and (B) his motion to represent himself (*Faretta, supra*, 422 U.S. at p. 836 [45 L.Ed.2d at p. 582]). We begin by recounting the lengthy procedure relevant to these contentions.

On August 8, 2014, after Caylor's arraignment, the trial court appointed attorney Peter Kmeto to represent him.

On October 23, 2014, Caylor filed a *Faretta* motion. Judge Michael Savage granted the motion on October 28, 2014.

On December 23, 2014, Caylor filed a motion to have "assistant counsel" appointed and to replace his investigator. In his motion, Caylor wrote "that if this is the type of **'Evenhanded'** Justice [the trial court] speaks of in court, then we are truly in for a long haul of **discoverable violations** committed within this Sacramento County Judicial System and ranks." Judge Jaime Román denied the motions, observing that Caylor appeared to focus on "sidetracking" the case.

On April 7, 2015, Caylor filed a motion for advisory counsel, characterizing the motion as his third attempt to have advisory counsel appointed. In the motion, Caylor wrote: "If[] nothing else [Caylor] prays this court will recognize his persistence in the matter and acknowledge he will be back a fourth, fifth or however many attempts it will take to secure the sought request." Judge Román denied the motion; however, after Caylor filed a renewed motion, the trial court appointed attorney Jessica Graves as advisory counsel "to answer legal questions relating to the [] matter and not to assist him

6

in preparing or presenting submissions or attending any court appearances." (Fn. omitted.)

On May 20, 2015, Judge Román issued an order to show cause why the appointment of advisory counsel should be revoked because, "despite the limitation of the order, [Caylor's] expectation for services exceeds the parameters of [counsel's] appointment." However, on May 27, 2015, Judge Román deferred action on the order to show cause.

On June 24, 2015, Caylor filed a motion to substitute new advisory counsel in place of attorney Graves, alleging she failed to contact him. It does not appear the trial court ruled on this motion.

On July 8, 2015, Caylor withdrew his request to represent himself. Judge Allen Sumner ordered that counsel be appointed. Attorney Laurence Smith was appointed.

On July 14, 2015, Caylor made another *Faretta* motion. Judge Román ruled: "[I]t appears that [Caylor] either does not know what he wants or . . . is 'gaming.' Neither approach compels salutary relief. [Caylor's] oral *Faretta* motion of July 14, 2014 is accordingly denied." Also on July 14, 2015, attorney Smith expressed a doubt about Caylor's competence to stand trial. Judge Román suspended criminal proceedings and initiated section 1369 proceedings.

On July 24, 2015, Caylor submitted ex parte documents seeking emergency relief to invoke his *Faretta* rights. Judge Román summarily denied the request.

On September 17, 2015, Judge Román reinstated criminal proceedings.

Caylor refused to appear for proceedings on September 9 and 17, 2015, so Judge Román issued a cell-extraction order for Caylor to appear on September 23, 2015.

On September 23, 2015, Caylor made another oral *Faretta* motion. Judge Román denied the motion.

On September 25, 2015, Caylor filed a written *Marsden* motion seeking to replace attorney Smith or, in the alternative, to represent himself.

On December 17, 2015, Caylor refused to appear. Judge Román denied the *Marsden* motion without prejudice. Judge Román also issued another extraction order.

On January 22, 2016, Caylor again moved to replace attorney Smith or, in the alternative, to represent himself. And, on February 19, 2016, Judge Michael Bowman granted Caylor's request to represent himself and appointed attorney Jennifer Mouzis as advisory counsel.

On August 9, 2016, Caylor was present in court representing himself for the first day of trial, with Judge Michael Kenny presiding.

On August 11, 2016, defendant refused to appear.

On August 15, 2106, Caylor appeared for trial. He said that he had refused to appear on August 11 because advisory counsel had not visited him. He also complained that the pro. per. coordinator and investigator were not cooperating. Finally, Caylor asked for appointment of counsel. Judge Kenny noted that defendant had counsel before, as well as advisory counsel, and had refused to come to court as a way of trying to accomplish his objectives. Judge Kenny denied the request for appointment of counsel as untimely. Judge Kenny also informed Caylor that, if he refused to come to court, it would be treated as a voluntary absence and that trial would proceed. Later, during the proceedings of the day, Caylor reiterated that he wanted counsel. When he did not get his way, Caylor began yelling and using profanity, and said, apparently referring to the court and others involved in the pro. per. services, "You are all going to pay for this shit."

On August 16, 2016, Caylor voluntarily appeared in jail clothing.

On August 17, 2016, before jury selection started, defendant objected when told he could not stand during jury selection. He added: "And I need an attorney. I need to get that on the record." Judge Kenny told Caylor he could not tell the jury he had requested counsel, and Judge Kenny rejected his request. Judge Kenny said: "[Y]our self-representation status is not an issue for the jury. You decided to go pro per, you have removed two attorneys. . . . [T]his past Monday you elected to change your mind. At

8

that point in time the Court denied the request.  [¶]  The Court would also note that, in fact, I originally gave you a continuance at your request when you first had this case assigned to this Court.  The Court would also note that you refused to come to court last week.  So when you look at all those things, the Court did not believe that, in fact, you were playing it straight."  Judge Kenny reminded Caylor that his request for counsel was denied because it was untimely.  Still later the same day, Caylor asked a prospective juror whether the juror would "feel differently if I needed help in this case but couldn't get it?"  Judge Kenny sustained the prosecutor's objection to the question.

On August 18, 2016, Caylor again said in front of the jury panel that he needed counsel.  Judge Kenny excused the prospective jurors and discussed with Caylor the fact that he could not raise the issue of assistance of counsel with the jury.  During the discussion, Caylor repeatedly said he needed counsel and added:  "I need counsel.  And, again, I say that, I need counsel.  And I will say that every time we bring a jury in here until we get counsel for me.  I need counsel."  Judge Kenny summarized Caylor's past requests and concluded:  "And what this Court sees, Mr. Caylor, is a continual pattern in which you go back and forth as a way of apparently attempting to delay the proceedings."  Caylor stated again that he needed counsel and would tell the jury so "every time."  Caylor said he would accept any counsel except attorney Smith, who he believed had a conflict because attorney Smith had a client who attempted to be a "snitch" in this case.  Caylor added that he would file a *Marsden* motion if attorney Smith were reappointed and that he had made a complaint to the State Bar about attorney Smith.

Still on August 18, 2016, the prosecutor and Judge Kenny agreed the jury panel had been tainted by Caylor's statements about needing counsel to the extent that the parties would not be afforded a fair trial.  Judge Kenny told Caylor that, if Judge Kenny referred Caylor to the panel for appointment of counsel, it was possible attorney Smith would be reappointed because he was the most familiar with the case.  Judge Kenny also told Caylor that attorney Smith did not necessarily have a conflict of interest just because

9

Caylor believed one existed. Concerning the possibility that attorney Smith would be reappointed, Judge Kenny warned Caylor that, if Caylor filed another *Faretta* motion to avoid being represented by attorney Smith, Judge Kenny would consider it an attempt to "manipulate the system." With that, Judge Kenny declared a mistrial and referred the matter to the panel to send an attorney to represent Caylor.

On August 22, 2016, the criminal conflict panel accepted the case, and on August 29, 2016, attorney Smith was reappointed as Caylor's counsel. Judge Kenny set trial for November 7, 2016.

Also on August 29, 2016, Caylor filed a *Marsden* motion, seeking replacement of attorney Smith. He asserted attorney Smith had a conflict of interest and had given ineffective assistance. In support of the motion, Caylor filed the following two allegations: (1) "Mr. Laurance Smith <u>did</u> represent a Jailhouse Snitch Sophia Roses <u>at the time</u> Ms. Roses contacted Deputy District Attorney Donnell Slivka <u>to provide</u> 'Some Information' In the <u>Hamilton/Caylor Case 14-F0-1906</u> on July 25th and Aug 6th 2014," and (2) "Mr. Laurance Smith <u>did state</u> in a letter on Sept. 9th 2015 that <u>this defendant</u> 'became very angry and said things that were <u>clearly threats against my life</u>' (his life)." Caylor included a memorandum from the prosecutor that Roses had contacted her but that the prosecutor would not be contacting Roses to take a statement.

Judge Kenny heard the *Marsden* motion on August 31, 2016.

Concerning attorney Smith representing Roses, Caylor said that the calls from the jail to the prosecutor were recorded and there may have been content that should have been given to Caylor. Attorney Smith was representing Roses at the time, and so he cannot get the information from the prosecutor. Attorney Smith told Caylor he could not do anything because Roses did not give the prosecutor any information. Attorney Smith failed to advise Caylor of the Roses matter, and Caylor did not trust attorney Smith. Attorney Smith responded to the allegations by observing that Roses was "very interested" in being an informant against individuals she encountered, that the prosecutor

10

was aware of Roses's tendency, that Roses never gave attorney Smith any information concerning Caylor or this case, and that the prosecution believed Roses was untrustworthy and "crazy."

Concerning Caylor's threats against attorney Smith, Caylor said he disagreed that he made threats against attorney Smith's life, but, if he did, Caylor could not trust attorney Smith to defend him. Attorney Smith responded that Caylor had unrealistic expectations about what issues could be raised successfully. Caylor told attorney Smith that, if he did not do what Caylor wanted him to do, attorney Smith would be "a [ ] dead mother fucker." Attorney Smith did not report the threat because it did not scare him, and attorney Smith believed Caylor was trying to manipulate him into declaring a conflict. Attorney Smith had no problem representing Caylor to the best of his ability.

Caylor claimed he and attorney Smith could not communicate.

Judge Kenny asked the prosecutor to enter the courtroom and asked the prosecutor about her conversation with Roses. The prosecutor said she told Roses she could not talk to her and hung up. She did not get any information from Roses.

Judge Kenny excused the prosecutor from the courtroom and denied the *Marsden* motion. Caylor responded, saying, "Fuck you. Let's roll." Caylor continued to use profanity, apparently directed to the trial court and attorney Smith, as the trial court invited the prosecutor back into the courtroom and informed the prosecutor that the motion had been denied.

On November 2, 2016, Caylor again filed *Marsden* and *Faretta* motions. Caylor alleged attorney Smith had failed to meet with him to prepare for trial and that attorney Smith did not intend to fight for Caylor but was instead "incahoots" (*sic*) with the prosecutor. He claimed he was not seeking continuance of the trial, which was still scheduled for November 7, 2016, and that he was willing to be shackled if he did not control his emotions. Finally, he offered his "sacred pinky swear" that he would behave himself.

11

Judge Kenny held a closed hearing on Caylor's *Marsden* motion on November 8, 2016. Caylor claimed attorney Smith had failed to communicate with him. Attorney Smith responded that he had been busy with two other murder cases. But those were finished, and he had refocused on Caylor's case, including a long meeting with the pro. per. investigator who had worked on Caylor's case. After that meeting, attorney Smith met with Caylor. In that meeting, Caylor said he wanted to defend the case by arguing he did not commit the crimes but that someone else, whom Caylor would not identify, committed the crimes. Attorney Smith was prepared to go forward, with or without a continuance. Caylor said he would rather represent himself than have attorney Smith represent him, so he withdrew his *Marsden* motion in favor of moving to represent himself. After more discussion, Caylor withdrew his withdrawal of the *Marsden* motion, and Judge Kenny denied the motion, saying that he did not believe there was insufficient preparation or communication.

Judge Kenny then considered the *Faretta* motion in open court and denied it. Caylor again stated he was ready to go to trial and that attorney Smith could be standby counsel. Judge Kenny found that Caylor had waited until right before trial to make the motion. Judge Kenny also found that the motion was made to disrupt the proceedings.

### A

Caylor contends the trial court erred by denying the *Marsden* motions on August 31, 2016, and November 8, 2016, because it did not sufficiently satisfy its duty of inquiry and because the conflict between Caylor and attorney Smith was irreconcilable.

Under *Marsden*, when a defendant moves to replace appointed counsel, the trial court must inquire into the reasons for the dissatisfaction and exercise its discretion in deciding whether to replace counsel. (See *People v. Lucky* (1988) 45 Cal.3d 259, 281; *Marsden, supra*, 2 Cal.3d at p. 124.) "[T]he trial court cannot thoughtfully exercise its discretion in this matter without listening to [the defendant's] reasons for requesting a change of attorneys." (*Marsden*, at p. 123.) " '[T]he court must consider any specific

12

examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would 'substantially impair' the defendant's right to assistance of counsel. [Citations.]' " (*People v. Smith* (1993) 6 Cal.4th 684, 690-691 (*Smith*).)

"[S]ubstitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*Smith, supra*, 6 Cal.4th at p. 696.)

Caylor's claim that the trial court did not inquire sufficiently into Caylor's reasons for wanting substitute counsel is without merit. On both occasions, the trial court allowed Caylor to fully state his reasons for believing substitute counsel should be appointed, and the trial court also inquired of attorney Smith concerning Caylor's reasons. Contrary to Caylor's position on appeal, the trial court was not required to do any further investigation into Caylor's reasons. For example, the trial court was not required to examine whether attorney Smith should have obtained recordings of the calls from Roses to the prosecutor or to investigate further the extent of attorney Smith's discussions with Caylor in preparation for trial. Nothing more was required.

Concerning Caylor's argument that attorney Smith had not sufficiently prepared for trial or communicated with Caylor, the record is sufficient to show both preparation and communication, even if it was not in the way Caylor preferred. This case is similar to the denial of the *Marsden* motion upheld on appeal in *People v. Cole* (2004) 33 Cal.4th 1158, in which the California Supreme Court wrote: "Under the totality of the

13

circumstances, we find no abuse of discretion. First, 'the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence.' [Citation.] Second, defendant's complaints regarding [defense counsel's] purported inadequate investigation, trial preparation, and trial strategy were essentially tactical disagreements, which do not by themselves constitute an 'irreconcilable conflict.' [Citation.] Indeed, a 'defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense.' [Citation.] 'Nothing in the record here shows that [defense counsel] was incompetent or would not provide adequate representation if he received defendant's cooperation.' [Citation.] Rather, defendant's complaints mostly show disagreement as to tactics, which, by itself, is insufficient to compel discharge of appointed counsel. [Citation.] As we have stated, 'the trial court need not conclude that an *irreconcilable* conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness.' [Citation.] Such appears to be the case here. We therefore conclude that the court did not act unreasonably in denying the *Marsden* motion." (*Id*. at pp. 1192-1193.)

Additionally, in Caylor's case, the trial court was justified in concluding that Caylor was merely trying to disrupt the proceedings for delay or whatever benefit he believed he could derive from the disruption. A defendant cannot force substitution of counsel by his own misconduct. (*Smith, supra*, 6 Cal.4th at p. 696.)

B

Caylor contends the trial court erred by denying his *Faretta* motion on November 8, 2016, because he had tried but was unable to work with attorney Smith, he was prepared to go to trial without a continuance, and he was willing to have attorney Smith as standby counsel.

A criminal defendant has the right to represent himself or herself at trial. (*Faretta, supra*, 422 U.S. at p. 836 [45 L.Ed.2d at p. 582].) However, the trial court "may

14

terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Id.* at pp. 834, fn. 46 [45 L.Ed.2d at p. 581, fn. 46].)

Caylor's argument on appeal is without merit because the trial court was justified in finding Caylor was not credible and could not be trusted to follow through on his promise that he was ready for trial and would not be disruptive. A reading of the procedure leading up to the denial of the *Faretta* motion on November 8, 2016, makes it apparent to any reasonable person that Caylor would continue to commit misconduct prejudicial to the administration of justice.

Concerning a denial of a *Faretta* motion, the California Supreme Court wrote: "[A] trial court must undertake the task of deciding whether a defendant is and will remain so disruptive, obstreperous, disobedient, disrespectful or obstructionist in his or her actions or words as to preclude the exercise of the right to self-representation. The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' [Citations.] We see no reason not to use the same deference when it comes to deciding whether a defendant's motion for self-representation should be granted in the first instance." (*People v. Welch* (1999) 20 Cal.4th 701, 735.)

The trial record amply supports Judge Kenny's exercise of discretion in determining that Caylor's prior conduct precluded him from exercising his right to self-representation.

## II

Caylor and Hamilton both contend the trial court abused its discretion and violated their due process and fair trial rights by admitting video evidence of Caylor taking a gun from Hamilton's purse more than a year before the current crimes.

Hamilton moved in limine to exclude evidence of Caylor taking a gun from her purse more than a year before the crimes in this case. The evidence was in the form of a surveillance video from a camera maintained by Parnami's business in November 2012.

15

Hamilton and Caylor appear in the video, walking to their cars. Hamilton opens her purse, and Caylor takes a gun from the purse. They each get into a separate vehicle and drive away. Caylor was representing himself at the time of Hamilton's pretrial motion, and he had refused to come to court; however, his counsel later joined in the objection to the video evidence. The trial court denied the motion to exclude the evidence.

On appeal, defendants argue that admission of the video evidence was a prejudicial abuse of discretion because the video lacked relevance, was inadmissible character evidence under Evidence Code section 1101, and, if the video was relevant, the prejudicial effect of the video substantially outweighed the probative value under Evidence Code section 352. They further argue that the abuse of discretion in admitting the video violated their constitutional due process rights.

Before we consider defendants' argument, we reject the Attorney General's claim Caylor forfeited consideration of the issue on appeal. The Attorney General argues that the trial court originally denied the motion to exclude the video evidence when Caylor was not participating in the proceedings, and Caylor could not object later, even before admission of the evidence, because there had been no material change in the circumstances since the denial of the pretrial motion. This argument fails because the evidence had not been admitted when Caylor joined the motion, and the trial court could have changed its ruling at that point. The Attorney General's argument that the pretrial motion was "final" and could not be reconsidered absent a change of circumstances is without merit. His citation to *People v. Crittenden* (1994) 9 Cal.4th 83, at page 127 is unavailing because that case dealt with the issue of whether a pretrial motion to exclude evidence preserved the issue for appeal. This case, on the other hand, concerns whether a mid-trial objection to evidence preserves the issue for appeal, and the Attorney General offers no authority that the mid-trial objection does not preserve the issue. We know of none.

The evidence was relevant because it connected both Hamilton and Caylor to Hamilton's purse and the handgun used in the crimes. It showed that Hamilton gave Caylor access to the handgun. In that way, it is not character, propensity, or habit evidence.

Only relevant evidence is admissible. (Evid. Code, § 350.) "Section 210 of the Evidence Code defines as 'relevant' such evidence as has 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Alcala* (1992) 4 Cal.4th 742, 797 (*Alcala*).)

In *Alcala*, the trial court admitted into evidence two Kane Kut knife sets that were found in a search of the defendant's residence because a knife found at the murder scene was a Kane Kut knife, even though the knife found at the scene was not part of the sets found at defendant's residence. On appeal, the defendant argued that the Kane Kut knife sets found in the search of his residence were irrelevant because the brand of the knives was the only common element between the knife found at the scene and the knife sets found in defendant's residence. (*Alcala, supra*, 4 Cal.4th at pp. 796-797.) The California Supreme Court concluded that the knife sets were relevant and admissible: "Under [the] broad definition [of relevance], the trial court properly could determine that despite the relatively weak probative value of the knife sets, they might have some tendency to prove that defendant had access to, or familiarity with, the particular brand of carving knife found near the crime scene. Accordingly, we uphold the trial court's determination that the knife sets were relevant and therefore admissible. (Evid. Code, §§ 210, 350.)" (*Id.* at p. 797.)

The circumstances of this case are similar to *Alcala* in that the video evidence showed Caylor had access to and familiarity with Hamilton's handgun. Unlike *Alcala* though, the probative value of the evidence in this case was not weak because it showed how Caylor accessed the specific handgun used in the murder of Alawsi, the robbery of

17

Thury-Taylor, and the attempted murder of Parnami. It also showed that the handgun belonged to Hamilton and that she shared it with Caylor.

The *Alacala* court also found that the admission of the knife sets was not an abuse of discretion under Evidence Code section 352: "[W]e discern no error in the trial court's exercise of discretion under section 352 of the Evidence Code. At the evidentiary hearing, the trial court weighed the probative value of the knife sets against the danger that their admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The trial court noted that, in view of the difference in appearance between the carving knife and the complete knife sets, the jury could not possibly be misled into believing that the carving knife had been removed from either of the sets of knives. Subsequently, but prior to the trial court's final ruling on the admissibility of this evidence, the testimony of the Kane Kutlery representative established that the carving knife was not part of either of the knife sets seized from defendant's residence. Thus, although the probative value of the knife sets was weak, the danger of confusion, speculation, or prejudice was minimal. We find no abuse of discretion." (*Alcala, supra*, 4 Cal.4th at p. 797.)

Here, the probative value was stronger. The evidence was highly probative to show that Caylor had access to a handgun that Hamilton kept in her purse and that Hamilton willingly let Caylor use the handgun. Also, the possibility of prejudice did not substantially outweigh the probative value. Therefore, admission of the video evidence was not an abuse of discretion under Evidence Code section 352.

This was not character or propensity evidence under Evidence Code section 1101. Instead, it was evidence of the relationship between Hamilton and Caylor and the access that Hamilton willingly gave Caylor to the handgun in her purse.

Finally, the trial court's admission of the video evidence did not violate defendants' constitutional due process rights. Admission of evidence under state rules of

18

evidence generally does not violate a defendant's due process rights. (*People v. Lucas* (1995) 12 Cal.4th 415, 464 (*Lucas*).)

III

Caylor contends the trial court abused its discretion and violated his constitutional due process rights when it denied his motion to exclude evidence of derogatory racial remarks he had made about Parnami. Hamilton joins Caylor's argument.

"[E]vidence should be excluded [pursuant to Evidence Code section 352] as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating [jurors] to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009 (*Vorse*).)

During trial, Caylor's counsel made a motion to exclude any derogatory racial remarks Caylor made about Parnami (for example, calling him a "rag head" and telling him to go back to his own country) because they were unduly prejudicial under Evidence Code section 352. The prosecutor argued the evidence was relevant because it showed defendants' animus toward Parnami on the attempted murder count and showed a motive for Caylor to shoot Alawsi in the Home Depot parking lot. Concerning Alawsi, Caylor's counsel observed that the murder had not been charged as a hate crime. The trial court denied the Evidence Code section 352 motion.

The trial court did not abuse its discretion by admitting the evidence of Caylor's derogatory racial remarks about Parnami. Caylor was charged with the attempted murder of Parnami; therefore, his intent and motive were relevant. The evidence was also relevant in showing it was Caylor who shot Alawsi. Furthermore, a few derogatory racial remarks is not evidence so inflammatory to cause the jury to disregard the facts and find defendants guilty. (*Vorse, supra*, 53 Cal.App.4th at p. 1009.)

19

Caylor also argues on appeal that the evidence was improper character evidence under Evidence Code section 1101; however, he did not make that objection in the trial court. It is therefore forfeited. (*People v. Doolin* (2009) 45 Cal.4th 390, 437 (*Doolin*).)

Additionally, Caylor argues that his intent and motive were not at issue because there was no dispute about who fired the shots. But Caylor did not make this argument in the trial court. It is also forfeited. (*Doolin, supra*, 45 Cal.4th at p. 438.)

Finally, Caylor asserts admission of the evidence of his derogatory racial remarks about Parnami violated his constitutional due process rights. However, admission of evidence under state rules of evidence generally does not violate a defendant's due process rights. (*Lucas, supra*, 12 Cal.4th at p. 464.)

IV

Hamilton contends the trial court prejudicially erred by instructing the jury on the defense of withdrawal as an aider and abettor. The Attorney General responds that Hamilton forfeited consideration of this issue by objecting too late to the instruction and, in the alternative, there was no prejudice.

Toward the end of trial, the trial court met with counsel to discuss jury instructions. The trial court indicated it would give CALCRIM No. 401, relating to aiding and abetting. That instruction includes the defense of withdrawal. (CALCRIM No. 401.) Hamilton expressed no objection to the instruction.

In closing argument, the prosecutor argued Hamilton did not withdraw her aiding and abetting of the crimes against Thury-Taylor and Parnami. After this argument, Hamilton objected to including the withdrawal portion of the aiding and abetting instruction because it was inapplicable on the facts of this case and could confuse the jury. The trial court overruled the objection.

In its instructions to the jury, the trial court gave CALCRIM No. 401 on aiding and abetting liability, as follows:

20

"To prove that Kari Hamilton is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"1. The perpetrator committed the crime.

"2. The defendant knew that the perpetrator intended to commit the crime.

"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime.

"And, 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] . . . [¶]

"If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him or her an aider and abettor."

The trial court continued to the withdrawal portion of the aiding and abetting instruction (CALCRIM No. 401):

"A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things:

"1. He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating. The notification must be made early enough to prevent the commission of the crime.

"And, 2. He or she must do everything reasonably within his or her power to prevent the crime from being committed. He or she does not have to actually prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

21

We need not consider separately the Attorney General's argument that Hamilton's objection to the withdrawal instruction was untimely under section 1093.5 because we must consider whether an instruction affected a defendant's substantial rights even if there was no objection. We will conclude the instruction on withdrawal did not affect Hamilton's substantial rights because it was not prejudicial. (See *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249 [substantial rights not affected if error not prejudicial]; § 1259.)

The Attorney General makes no attempt to defend the giving of the withdrawal portion of the aiding and abetting instruction, so we proceed directly to a prejudice analysis. Furthermore, the Attorney General argues we should apply the state standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836, instead of the federal standard under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705], as argued by Hamilton. But we need not resolve the argument because any error in giving the withdrawal portion of the aiding and abetting instruction was harmless beyond a reasonable doubt under the more stringent federal standard.

Hamilton argues: "The [trial] court's instruction on withdrawal immediately followed its statements that presence alone was insufficient [to conclude Hamilton was an aider and abettor], and as such created a likelihood of jury confusion that the two were tied together in the proof required to be made by the prosecution, i.e.[,] presence alone is not enough, rather a person is not guilty if she withdraws." This argument is nothing but speculation that the jury may have disregarded or failed to intelligently apply the aiding and abetting instruction after hearing that withdrawal is a defense to aiding and abetting. There is no evidence or implication in this case that the jury so disregarded its instructed duty with regard to finding aiding and abetting, and we presume that the jury intelligently followed the trial court's instructions. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.)

Any error in giving the withdrawal portion of the aiding and abetting instruction was harmless beyond a reasonable doubt.

Hamilton contends the evidence was insufficient to support her conviction for attempted murder of Parnami as an aider and abettor because there was insufficient evidence of the intent of Caylor and Hamilton to kill Parnami and of Hamilton's acts to encourage or facilitate the attempted murder.

When an appellant contends the evidence was insufficient to support a conviction, the " ' "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] '[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] 'Evidence is sufficient to support a conviction only if it is substantial, that is, if it " 'reasonably inspires confidence' " [citation], and is "credible and of solid value." ' " (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 103-104 (*Fromuth*).) We affirm unless the appellant establishes " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.] Neither mere presence at the scene of a crime, nor the failure to take steps to prevent a crime, is alone sufficient to establish that a person is an aider and abettor. Such evidence may, however, be considered together with other evidence in determining that a person is an aider and abettor. [Citation.]" (*In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460, italics omitted.)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by

act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561 (*Beeman*).)

"When the definition of the offense includes the intent to do some act or achieve some consequence beyond the actus reus of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. By 'share' we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. [Citation.] Rather, an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Beeman, supra*, 35 Cal.3d at p. 560, italics omitted.)

" 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)

To prove attempted murder, the prosecution must establish the defendant took a direct but ineffective step toward killing the victim and the defendant intended to kill the victim. (CALCRIM No. 600.) Therefore, to prove Hamilton aided and abetted the attempted murder of Parnami, the prosecution had to establish, as relevant here, Hamilton and Caylor shared an intent to kill Parnami and by act or advice Hamilton aided, promoted, encouraged, or instigated the attempted murder. The trial court did not instruct the jury concerning the natural and probable consequences theory, so the only way to get to aiding and abetting attempted murder was for Hamilton to share Caylor's intent to kill.

The shared intent of Caylor and Hamilton to kill Parnami is manifest in the events leading up to the attempt, the facts of the attempt itself, and the evidence discovered after the attempt.

24

Hamilton had a handgun and gave Caylor access to that gun. Both Hamilton and Caylor displayed their animus toward Parnami while they were running the smoke shop in the building owned by Parnami. They yelled at him and used racial and ethnic slurs against him. Hamilton was with Caylor just the day before the Parnami incident when Caylor shot and killed Alawsi using Hamilton's handgun.

As Parnami was outside his business, Caylor drove up with Hamilton in the front passenger seat. Caylor pointed Hamilton's handgun at Parnami and pulled the trigger three times. While the handgun did not fire, it made a clicking sound indicative of the safety not being engaged. Caylor said Parnami was lucky, and, as Caylor drove off, added, "I almost got him."

When Caylor and Hamilton were arrested in Chico, the handgun was still with them. A live round was in the chamber, and other rounds were in the magazine. The ammunition bought after the attempt on Parnami was unopened.

This evidence supports reasonable inferences that Hamilton willingly and continuously let Caylor use her handgun. Caylor disliked Parnami and intended to kill Parnami after having killed another apparent foreigner the day before. Hamilton also disliked Parnami, knew Caylor intended to kill Parnami, and let Caylor use the handgun for that purpose. Hamilton also intended to kill Parnami as an aider and abettor to Caylor.

Nonetheless, Hamilton argues that the evidence was insufficient to support her conviction for attempted murder of Parnami because there was no evidence the handgun was loaded at the time of the attempt. To the contrary, the handgun was obviously loaded when Caylor shot Alawsi, and it was loaded when Caylor and Hamilton were arrested later on the day of the attempt against Parnami. That evidence was sufficient for the jury to conclude the handgun was loaded or that Caylor and Hamilton believed it was loaded when Caylor aimed the handgun at Parnami and pulled the trigger. Furthermore, the fact that they went and bought ammunition after the attempt on Parnami supports an inference

25

that they attributed the apparent malfunction of the handgun to absence of ammunition when, in fact, it was some other malfunction. Even if the evidence also supported an inference that the handgun was not loaded and that Caylor and Hamilton believed it was not loaded, those possible inferences do not invalidate the opposing and reasonable inferences drawn by the jury because we evaluate the evidence and draw reasonable inferences in the light most favorable to the judgment. (*Fromuth, supra*, 2 Cal.App.5th at pp. 103-104.)

Hamilton also argues the evidence was insufficient to support an inference that Hamilton encouraged or aided Caylor in the attempt to kill Parnami. Again, her argument is really just that there was evidence from which the jury could have inferred she did not encourage or aid Caylor. For example, she observes there was no evidence of a conversation between Caylor and Hamilton about killing Parnami. There was no evidence Hamilton handed the handgun to Caylor just before he pointed it at Parnami and pulled the trigger. And there was no evidence of prior violence by Caylor or Hamilton against Parnami, even if there was evidence that they did not like him. These arguments, however, do not establish that the jury's inferences were unreasonable.

Accordingly, the evidence was sufficient to support the jury's verdict that Hamilton aided and abetted the attempted murder of Parnami.

VI

The trial court sentenced Hamilton to consecutive terms for the robbery and vehicle theft counts involving Thury-Taylor: one year (one-third the middle term) for robbery (§ 211) and eight months (also one-third the middle term) for vehicle theft (Veh. Code, § 10851). On appeal, Hamilton contends the trial court erred by not staying the term for vehicle theft under section 654 because the robbery and vehicle theft were one indivisible course of conduct. The Attorney General agrees, as do we. The term imposed for the vehicle theft must be stayed under section 654.

26

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." " ' "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104-105.) The court's implicit or express determination whether to impose consecutive sentences or find that section 654 is applicable will be upheld on appeal if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

While, technically, the two crimes against Thury-Taylor of robbery and vehicle theft were completed by separate acts (taking the keys, then taking the vehicle), they were both incident to the sole objective of taking the vehicle. After imposing the consecutive term for robbery, the trial court stayed the term on the burglary conviction, also arising from the same course of conduct, but the trial court imposed a consecutive term for the vehicle theft. Under these circumstances, the trial court also should have stayed the vehicle theft term, which was shorter than the robbery term. (§ 654, subd. (a).) We therefore will modify the sentence by staying the term for vehicle theft.

VII

When the trial court sentenced Hamilton, it imposed the following fine and assessments:

- a $3,900 restitution fine under section 1202.4, subdivision (b);
- a $200 court operations assessment under section 1465.8, subdivision (a); and
- a $150 court facility assessment under Government Code section 70373, subdivision (a)(1).

27

The trial court did not determine Hamilton's ability to pay the fine and assessments.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the court held it is improper to impose certain fines or assessments without determining a defendant's ability to pay. (*Id.* at pp. 1168, 1172.) Hamilton now contends we must vacate the imposed assessments and stay the restitution fine because the trial court did not determine her ability to pay and absent an ability to pay determination, they are unconstitutional under *Dueñas*.

*Dueñas* held "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373." (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.) The *Dueñas* court also held "that although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid.*)

We are not persuaded that the analysis used in *Dueñas* is correct. We agree instead with the numerous cases holding that due process does not require determination of a defendant's present ability to pay before imposing the fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.) Accordingly, we reject Hamilton's *Dueñas* challenge.

DISPOSITION

As to Caylor, the judgment is affirmed.

As to Hamilton, the sentence is modified to stay the term for vehicle theft. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment as to Hamilton and send it to the Department of Corrections and Rehabilitation.


                                        /s/
                                    RAYE, P. J.



I concur:



        /s/
BLEASE, J.




29

MAURO, J., Concurring and Dissenting.

I fully concur in the majority opinion except for part VII of the Discussion, pertaining to the restitution fine and assessments.  As to that portion of the opinion, I dissent.

In *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the court held it is improper to impose certain fines or assessments without determining defendant's ability to pay. (*Id*. at pp. 1168, 1172.)  Although some courts have subsequently criticized *Dueñas*'s legal analysis (see, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946), *Dueñas* remains citable precedent.  Until the California Supreme Court has had an opportunity to resolve the current split in authority, I would remand the matter to give the trial court an opportunity to consider defendant Kari Ann Hamilton's ability to pay the imposed assessments.  But as for the restitution fine imposed by the trial court, I would conclude Hamilton forfeited the challenge to the fine because it was imposed above the minimum and Hamilton had an opportunity to object to it in the trial court but did not.


                                                                      /s/
                                                    MAURO, J.